UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 3:12-cv-00214-slc |
| v. | ) ) | |
| NORTHERN STAR HOSPITALITY D/B/A SPARX RESTAURANT; NORTHERN STAR PROPERTIES, LLC; AND NORTH BROADWAY HOLDINGS, INC., | ) ) ) ) ) ) | **MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | ) | |

Defendants'[1] motion for summary judgment should be denied. It rests on disputed facts, unsupported allegations, and legal misstatements. Viewing the evidence in the light most favorable to the EEOC, Sparx supervisors hung a racist display in the workplace, which included a drawing of a noose, a hooded Ku Klux Klansman, a swastika, and a KKK symbol. Dion Miller, who is black, complained about the display, but Sparx treated the incident as an ill-advised "joke." In the end, Sparx did nothing more than tell one of the supervisors involved not to do it again because his joke might be "misconstrued" as racist; it did nothing to the manager involved. Miller's complaint

---

[1] The Defendants are Northern Star Hospitality d/b/a Sparx Restaurant, Northern Star Properties, and North Broadway Holdings. Defendants have denied that Northern Star Properties and North Broadway Holdings are joint or successor employers, but they have not moved for summary judgment on this ground. Therefore, for simplicity's sake, the EEOC will refer to the Defendants collectively as "Defendants" or "Sparx" in this memorandum.

resulted in a sudden shift of his work environment; he had been considered an ideal

kitchen employee before, but now he was now regarded as someone with a bad attitude

and not a "team player."   Sparx fired Miller with no prior warning three weeks after his

complaint about the racist display.  A jury could find on these facts that Miller was

subjected to a severe incident of racial harassment creating a hostile work environment

and later fired in retaliation for his good faith complaint of the harassment.

## I.  FACTS

### A.    Overview of the parties.

Sparx Restaurant originally was a Green Mill franchise, and later became

independently operated as a family-style restaurant.  (EEOC Proposed Findings of Fact

("PFF") 1).[2]  Miller was Sparx's Assistant Kitchen Manager.  (PFF 2).  He had worked in

the kitchen as a line cook, and then was promoted to Assistant Kitchen Manager in 2009.

(PFF 3).   Upon becoming Assistant Kitchen Manager, his only additional duty was

ordering product for the restaurant.[3]  (PFF 4).  He took the job because Sparx agreed that

---

[2]  Sparx did not submit a statement of proposed findings of fact with its motion as required by the Court's procedures.  [Doc. 10].  It asserts a number of  alleged facts in its brief that have no bearing on its motion, such as "EEOC's actions put Sparx out of business," "EEOC launched a full scale assault aimed at running Sparx out of business," EEOC "failed to conduct a reasonable investigation," and "the overzealous EEOC acted as judge, jury and executioner of Sparx."  (Defs. Mem. in Supp. Sum. J. ("Defs. Mem.") 5, 8, 18, 40.)  The EEOC does not address these irrelevant *ad hominem* attacks.  There is currently a motion to dismiss pending before the Court on Defendants' claims about the EEOC's conduct.  [Doc. 33]

[3] Sparx contends that Miller was promoted to Assistant Kitchen Manager by Tom Nesheim, General Manager of Sparx, and that Miller's primary responsibility was to train new staff.  (Defs. Mem. 10).  To the contrary, Miller was promoted to Assistant Kitchen Manager before Nesheim was hired, and was not tasked with training new employees.  (PFF 6, 104).

he could remain an hourly employee. (PFF 5). He earned $14 an hour, which was in line with the $12.50 an hour that he earned a decade before as an assistant kitchen manager at a Perkins Family Restaurant in Woodbury, MN, a Twin Cities suburb. (PFF 7).

Miller was a good employee, a good cook, and a good coworker. (PFF 8). Prior to October 1, 2010, he had never been disciplined, counseled, warned or reprimanded. (PFF 9). He was an outstanding cook and "awesome" to work with. (PFF 10). He had never been told by anyone in Sparx management that he had a bad attitude, been coached in any way regarding his interactions with other employees, or told to take a more active leadership role in the kitchen. (PFF 11).

**B.    The racial depictions in the workplace.**

On September 30, 2010, Miller was scheduled to help with the monthly inventory of the kitchen food supplies after the restaurant closed at 11:00 p.m. (PFF 12). When Miller came in, however, his boss Evan Openshaw told him to go home. (PFF 13). Openshaw was the Kitchen Manager. (PFF 14). Chris Jarmuzek, Kitchen Supervisor and lead night cook, was also there. (PFF 15). Jarmuzek was the former Kitchen Manager, and was training Openshaw during this period. (PFF 16). Miller went home. (PFF 17).

The next day, October 1, 2010, Miller came in shortly before his scheduled 9:00 a.m. shift to prepare for the restaurant's 11:00 a.m. opening. (PFF 18). He was greeted by another kitchen employee, Alex Rivet, who told him to look at what had been posted on the kitchen cooler. (PFF 19).

On the kitchen cooler, Miller saw a one-dollar bill covered with racist symbols. (PFF 20). There was a noose around George Washington's neck. (PFF 21). There was a swastika on the President's forehead and a dark area on his cheek. (PFF 22). There was a hooded Klansman next to the President, with KKK written on the Klansman's hood. (PFF 23). There was a man on horseback on the dollar. (PFF 24). Under the dollar was a posting for kitchen employees; at the bottom of the notice was a picture of a smiling Gary Coleman, an African-American former child star in the sitcom, *Diff'rent Strokes*. (PFF 25). The defaced dollar bill covered language on the notice. (PFF 26).

Miller is black, and one of only two black employees then working at Sparx. (PFF 27). Miller was offended and hurt by the display on the cooler. (PFF 28). It "brought up a lot of hateful, hurtful memories, images that I really didn't care to see." (PFF 29). It brought up "the way that black people have been treated in this country." (PFF 30). As Miller said, "A noose in general is not right. I see a noose, I automatically think of lynching. I automatically think of hanging people. I also – the whole clan [sic] member there, that's also something that's – I just don't like it. Once again, it just reminds me of what they did to my people." (PFF 31). "Lynching of black people is just not acceptable." (PFF 32). The display made Miller angry, because "it depicts my people being slaughtered." (PFF 33).

**C.   Miller's complaints and Sparx's reaction.**

Miller asked a coworker, Amber Malean, to take a picture of the display with her phone "as evidence that somebody had just committed racist harassment in the

workplace," and waited for a manager to come in.  (PFF 34).  About an hour later, the Front of the House Manager (and later General Manager) Kim Deasy reported to work. (PFF 35).  Miller approached Deasy immediately, asking her to look at the items posted on the cooler.  (PFF 36).   Deasy told Miller that she did not know anything about it and that "Evan and those guys" were the last ones to leave the building the night before. (PFF 37).  Deasy testified that she did not get a clear look at the display, and that her hands were full and the telephone was ringing in her office, so she asked whether she could put her stuff down and that she would be back after she answered the phone call. (PFF 38).  She knew that Miller was upset.  (PFF 39).

The evidence varies widely as to what happened next.  Miller testified in his deposition that Deasy went into her office, and said nothing further to him about the racist display.  (PFF 40).  According to Miller, Evan Openshaw came in sometime before 11 a.m., and Miller confronted him about the display.  (PFF 41).  Openshaw told him that he had put the picture of Coleman up, and Chris Jarmuzek – the kitchen supervisor and former kitchen manager who had been working the night before – attached the dollar bill. (PFF 42).  Openshaw said it was a "joke."  (PFF 46).   Miller said that it wasn't funny and was offensive.  (PFF 47).  Miller demanded that the display be taken down.  (PFF 48).  Openshaw responded by asking whether Miller would be offended by a picture of David Hasselhoff, the white former star of the television shows *Baywatch* and *Knight Rider*, instead of the picture of Coleman. (PFF 49).  Miller said that he would not.  (PFF 50).  Openshaw took down the dollar bill and Coleman picture, and replaced it with a

notice bearing a picture of Hasselhoff.[4] (PFF 51). (There is no record of what became of the dollar bill.)

However, Deasy has testified differently. She asserts that she left Openshaw and Miller in the manager's office with the defaced dollar bill and the Coleman notice, and when they came out, they were "laughing and joking and they were getting back to their kitchen duties." (Deasy Dep. 23:21-25:11). She testified that she asked them if it was "all good," and they said it was. (*Id.* 24:17-25:11). She also states that Miller and Jarmuzek, the supervisor who posted the racist dollar bill, spoke that day; Jarmuzek apologized to Miller; and they worked together fine for the rest of the afternoon. (*Id.* 78:20-80:19).

While Sparx rests much of its argument on Deasy's supposed facts, they are very much disputed. Miller denies Deasy's version of events. Contrary to Deasy's assertions, Deasy did not follow up with him after his initial complaint. (PFF 52). Openshaw did not apologize. (PFF 54). Miller did not say everything was "all good." (PFF 55). He did not talk to Jarmuzek that day, and they did not work side-by-side in perfect harmony that afternoon. (PFF 56). He did not joke with Openshaw or Jarmuzek after the images were posted. (PFF 57).

---

[4] Sparx contends that the notice with Hasselhoff's picture was posted before October 1, and had only just been replaced by the Coleman picture. (Defs. Mem. 12, 35). There is no record evidence of this, and the deposition testimony cited by Sparx does not support that proposition. *See id., citing* Miller Dep. 57:15-17 ("Q. Did you find the picture of David Hasselhoff offensive? A. No.") If Sparx's assertion is true, however, the replacement of the Hasselhoff picture with the Coleman picture at the very time the defaced dollar bill with the racist symbols was posted above Coleman's face further emphasizes the racist nature of the cooler display.

**D.    The days following Miller's complaints.**

Miller did his job.  (PFF 58).  Because his immediate supervisor, Openshaw, had engaged or been complicit in the harassment, Miller felt he had no place to go. (PFF 59). He did not have much to say to Openshaw after his complaint.   (PFF 60).  Contrary to Deasy's testimony, Miller and Jarmuzek did not work on the same shift the day that Miller discovered the racist display.  (PFF 61).  They did not encounter each other for some days afterward.  (PFF 62). When they did see each other, Miller told Jarmuzek that he was racist.  (PFF 63).  Jarmuzek insisted that it was a joke. (PFF 64).   Jarmuzek took offense at being called a racist,  and objected to Miller, "hey, you know, I understand, you know, you think that I put this up there, you know, and it was racist, but it's not, you know.  I'm – clearly I'm not trying to present this as a racist remark or a racist comment or anything."  (PFF 65).   Although Jarmuzek contends that Miller said that "we're good," Miller never told Jarmuzek that things were good or resolved between them.  (PFF 55, 66).  Indeed, as Jarmuzek testified, Miller subsequently called him racist again, which offended Jarmuzek at first, but he eventually decided they were just "giving each other crap."  (PFF 67).

Jarmuzek did not receive discipline commensurate with his conduct, and there is no evidence that Openshaw was disciplined in any way.  According to General Manager Nesheim, the posting of the dollar bill with the racist images was a firing offense under Sparx's policies.  (PFF 68).  Apparently, all that Jarmuzek received was a lackluster verbal warning of which there is no documentation.  (PFF 69, 70).  According to

Jarmuzek, Deasy told him not to do it again because it might be misconstrued and "taken completely out of context."  (PFF 71).  Openshaw told Jarmuzek that "while it was taken out of context," Miller had seen the display as racist.  (PFF 72).

Jarmuzek continued as Kitchen Supervisor.  (PFF 73).  He does not recall ever losing any shift time or anything like that.[5]  (*Id.*)  Openshaw remained as Kitchen Manager and the direct supervisor of Miller.  (PFF 74).   Openshaw apparently was not disciplined. (*Id.*)

**E.    The fallout:  Miller's termination.**

After Miller's complaint about the dollar bill and the Coleman picture, Sparx started "small nitpicking" of Miller's performance to him.  (PFF 77).   Openshaw chastised Miller because another person on the cook line, Jodi Grouix, missed an order, asserting that Miller "threw her under the bus" by not catching the mistake earlier.  (PFF 78).  There is no evidence that Openshaw reprimanded Grouix, although she was not regarded as a strong cook.  (PFF 79).

More seriously, Jarmuzek and Openshaw began meeting with each other to review Miller's work and attitude.  (PFF 80).  Jarmuzek never had a meeting with Openshaw about Miller prior to Miller's complaint, (PFF 81), and previously had considered Miller an "ideal" kitchen employee upon whom he could count to back him up.  (PFF 82).  After

---

[5] Jarmuzek testified that he also received a written warning.  (Jarmuzek Dep. 51:7-10).  Sparx has not produced the purported warning, and on the contrary, it advised the EEOC during its investigation that Jarmuzek received only a verbal warning that was not documented.  (*See* PFF 70).

Miller's complaint, Jarmuzek started complaining to Openshaw that Miller was "attitude-ish," was not prepping the right way, and that his attitude had gone south.  (PFF 83).

On October 23, 2010, three weeks after his complaint, Miller was fired without prior warning.  (PFF 84).  Nesheim, Sparx's General Manager, made the decision to terminate Miller, but says he made it with the input of Openshaw (who had input from Jarmuzek) and Deasy.  (PFF 86).  Although Nesheim said that there had been talk of terminating Miller before, he admits that the final decision was made only after Miller's complaints about the racist display.[6]  (PFF 88).   Also, while Nesheim contends that he was never told about the dollar bill, (PFF 89), Deasy contests this, testifying that she told Nesheim that a graffiti-covered dollar bill had been posted and that Miller objected to it. (PFF 90).

**F.     Miller received no disciplinary warnings before his termination.**

Sparx's termination of Miller did not follow its progressive discipline policy, which was written on the termination notice itself.[7]  (PFF 91).   The policy states:

---

[6] Sparx cites Nesheim's testimony to support its assertion that Sparx planned to terminate Miller beginning in August or September 2010.  (Defs. Mem. 17).  This is not what Nesheim testified.  He dates the discussions as occurring in September or October 2010 – a significant difference since the racist imagery appeared on the kitchen cooler on September 30, Miller complained on October 1, and he was fired on October 23.  (*See* Nesheim Dep. at 75:8-13; 80:18-23).

[7] Although Sparx asserts that its employee handbook specified that "[b]eing uncooperative with fellow employees" was grounds for dismissal, (Defs. Mem. 16), Miller testified in his deposition that this handbook was not in place when he was employed at Sparx. (PFF 95).

---

**Sparx's Violation of Policy Ladder is as follows:**
2nd Violation – Written Warning, 3rd Violation – Sent home/One Day Suspension,
4th Violation – One Week Suspension, 5th Violation – Termination.
**Some Violations of Policy require more serious disciplinary action.**
*For every three months of discussion-free employment one level of violation status will be removed.*

---

(PFF 92). Nesheim identified things such as drinking on the job and theft as violations

that might require more serious disciplinary action. (PFF 93). He further testified that,

where other issues were involved, the employee would be given an opportunity to correct

themselves. (PFF 94).

Miller was never warned about his work performance or attitude. (PFF 98). Sparx

presents no testimony from anyone who issued a disciplinary warning to Miller or who

witnessed such a warning or any documents memorializing such a warning. (PFF 96, 97,

99, 101). For example, while Sparx asserts that "Miller had been warned on many

occasions about his poor attitude by Sparx, however, Miller's attitude only worsened with

time," (Defs. Mem. 27), Sparx relies on the following testimony from Nesheim:

> Q.     Was Mr. Miller's termination a result of a specific issue or a
>        combination of issues?
>
> A.     No single issue was his reason for being terminated. It was many,
>        many issues, all very minor on their own, but at some point what
>        number of minor issues do you keep tolerating?

(Nesheim Dep. 82: 9-14.) This testimony, of course, says nothing about prior warnings;

Nesheim does not recall issuing written warnings to Miller. (PFF 97). He also never sat

down to talk to him about his attitude. (*Id.*)

Elsewhere, Sparx asserts that "Openshaw had given Miller verbal warnings on several occasions for his poor attitude," citing Deasy's deposition at 55:17-19.  However, Deasy had no firsthand knowledge of such verbal warnings.  (*See* PFF 101).   She testified that what she overheard of the discussions between Openshaw and Miller consisted of "just, you know, I don't like how you are doing this, can you do this this way."  (*Id*.).  Deasy herself never reprimanded Miller.  (PFF 99).  Indeed, she testified that she got along well with Miller.  (PFF 100).

Similarly, Sparx relies on minor, disputed or inadmissible evidence to support its termination of Miller. For instance, it says that "Miller would talk back when given instructions and give excuses when he was talked to about his poor attitude and/or poor performance," but Sparx cites only to its own hearsay termination notice to Miller for the truth of the facts contained within it.  (Defs. Mem. 27 (citing Sparx 0012, which is the second page of Miller's termination notice, attached as Exhibit C to Vasichek Decl.)).  Sparx cites to testimony of Deasy that Miller complained about certain managers and employees.  (Def. Mem. 10-11).  Deasy testified, however, that she shared Miller's opinion of some of those persons, and there was nothing inappropriate about Miller discussing them with her.  (PFF 103).  Sparx asserts that Miller did not help train new employees, (Defs. Mem. 11), but the new employees were not on Miller's shift.  (PFF 104).  Sparx contends that Miller was too hard on Jodi Grouix (Defs. Mem. 11), but Sparx's General Manager acknowledges that Grouix was not a strong cook, and Miller

says he never had any problems communicating with her.[8]  (PFF 106, 107).  Sparx

alleges that Miller left before things were "prepped" for the night shift or did not prep

properly (Defs. Mem. 11); Miller never was criticized for not prepping properly, nor did

he ever purposefully leave things unprepared.  (PFF 108).

Even Nesheim, who says that he made the decision to fire Miller, testified that the

termination resulted from the culmination of minor things.  (PFF 110).  He also made the

decision, he says, with the input of Openshaw and Deasy.  (PFF 86).  A jury could find

that these "minor" things only became "major" things after Miller complained.

## G.     Events following Miller's termination.

After he was fired, Miller attempted to find a new job in the restaurant industry.

(PFF 111).  Contrary to Sparx's assertion, he did not ask Deasy for a job back at Sparx.

(PFF 112).  Amber Malean, who took the photograph of the racist images on the dollar

bill, was subsequently fired as well.  (PFF 113).  After Sparx cut her hours, Malean

applied for part-time unemployment.  (PFF 114).  *See* State of Wisconsin Department of

Workforce Development: Unemployment Insurance,

http://dwd.wisconsin.gov/uiben/computing_benefit_entitlement.htm#partial (discussing

calculation of partial unemployment compensation payments) (accessed 1/4/13).  Deasy,

now Sparx's General Manager, was upset by this.  (PFF 115).  Deasy fired Malean,

_____

[8] Sparx indicates that Grouix was an Acting Kitchen Manager supervising Miller for a time.  (See Defs. Mem. 11).  Grouix was never a Kitchen Manager while Miller was there, (PFF 105), and there is no record evidence to support Sparx's contrary assertion.  (See also PFF 106 (Grouix was not a strong cook)).  Grouix was not a new trainee when Nesheim started.  In fact, the only new trainees during this time did not work mornings on Miller's shift.  (PFF 104).

saying that since she wanted part-time unemployment, she could have full-time

unemployment.  (PFF 116).

## II.  ARGUMENT

The EEOC contends in this suit that Sparx violated Title VII of the Civil Rights

Act of 1964 by engaging in harassment of Miller because of his race, black, and

terminating his employment in retaliation for opposing race harassment.  (*See* EEOC

Amended Complaint ¶11 [Doc. 11] ("Since at least September, 2010, Defendants . . .

engaged in unlawful employment practices at its facility in Menomonie, Wisconsin . . .

by engaging in harassment of Miller because of his race, black, and terminating his

employment in retaliation for opposing race harassment."); *see also* Joint Scheduling

Conference Report Under Fed. R. Civ. P. 26 at ¶A [Doc. 9] (same). Because genuine

issues of material fact would permit the jury to find for the EEOC on these claims,

Sparx's motion for summary judgment should be denied.[9]

## A.     Summary judgment standard.

A motion for summary judgment should not be granted unless "the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no

---

[9] Sparx moves for summary judgment on the claim that Miller was fired because of his race, (Defs. Mem. 20-29), but the EEOC does not make such a claim in this lawsuit.  Its motion for summary judgment on this ground should be denied.

To the extent that Sparx's arguments on this claim seem applicable to the EEOC's claims of racial harassment and retaliation, however, the EEOC discusses them in that context.  For example, Sparx argues that Miller was not qualified for the position that he held and therefore cannot establish a prima facie case on the racial discharge claim.  (*Id.* 21-24).  That argument is not directly applicable to the EEOC's harassment and retaliation claims, but the EEOC addresses Sparx's underlying allegations about Miller's performance and attitude in responding to Sparx's motion for summary judgment on these two claims.

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When the nonmoving party comes forward with "specific facts showing that there is a genuine issue for trial," then summary judgment must be denied. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Genuine issues of material fact must be viewed in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007). There is a genuine issue of material fact if "the record taken as a whole" could "lead a rational trier of fact to find for the nonmoving party." *Matsushita*, 475 U.S. at 587. Although Sparx asks this Court to make credibility determinations of the witnesses, (Defs. Mem. 23 n.11), the Court cannot weigh credibility issues at the summary judgment stage. *AutoZone, Inc. v. Strick*, 543 F.3d 923, 934 (7th Cir. 2008).

**B.    A jury could find that Sparx subjected Miller to a hostile work environment because of his race.**

For harassment to reach the level of a violation of Title VII, the plaintiff must prove that his or her work environment was both subjectively and objectively offensive. *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002). The plaintiff must also show that the harassment was based on his or her membership in a protected class; the conduct was severe or pervasive; and there is a basis for employer liability. *Id.*; *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998).

**1.    The harassing conduct here was subjectively and objectively hostile.**

The subjective standard permits the Court to give proper weight to the employee's actual injury.

14

The subjective standard permits a court to give proper weight to the employee's injury in fact, acknowledging the different ways in which a plaintiff initially responds to or copes with harassment. The employee may quit "cold turkey" or, as in [plaintiff's] case, may experience a prolonged period of turmoil in which the individual regularly avoids the workplace for fear of suffering further harassment. Alternatively, an employee may react angrily to the racial hostility, and may more easily be provoked into arguments or physical altercations with those co-workers responsible for the harassment.

*Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1272 (1991).

Here, Miller was injured in fact by the racist display and Sparx's inadequate response to it. Miller was hurt and offended. The noose, the KKK symbol, the swastikas, the Klansman, the horseman, all above the smiling face of Gary Coleman, "brought up a lot of hateful, hurtful memories" about "the way black people have been treated in the country." The noose invoked lynching and hanging people. The Klan member and other images made Miller angry because "it depicts my people being slaughtered." While the posting was up, Miller requested that a co-worker take a photograph of the dollar bill "as evidence that somebody had just committed racist harassment in the workplace." Miller confronted Openshaw about the postings and demanded that Openshaw remove them. Openshaw told Miller it was a joke, but Miller responded that it wasn't a joke. Miller did not find the postings to be funny. Later, when Miller saw Jarmuzek, Miller also confronted him about the postings. Jarmuzek told Miller it was a joke. Miller told Jarmuzek that Jarmuzek was a racist.

Contributing to Miller's injury, the persons who engaged in the harassment or condoned it by defending it as a joke were Sparx's managers and supervisors--Openshaw,

the Kitchen Manager; Deasy, the Front of the House Manager; and Jarmuzek, the Kitchen

Supervisor.  And it was they who started nitpicking Miller's work after he complained.

As Miller testified, the incident affected the way that he viewed his employer, and

because the person to whom he was supposed to complain about the harassment – his

immediate supervisor – had engaged or been complicit in the harassment, Miller felt he

had no place to go.

A jury also could find that the conduct here was objectively harassing.  The

objective standard allows the jury to consider the conduct against a reasonableness

standard.

> Therefore, the objective standard allows the fact-finder to consider the work
> environment and the instances of harassment against a reasonableness
> standard. Application of the objective standard permits the evolution of a
> judicial consensus as to the constitutive elements of cognizable harassment
> in a hostile work environment.

*Daniels*, 937 F.2d at 1272.

Under all standards of reasonableness, the images posted at Sparx were objectively

offensive and harassing.   Certain imagery and epithets are offensive by standards of

civilized society, and where such language or imagery exists, the Seventh Circuit readily

finds triable claims of racial harassment exist.  *Daniels*, 937 F.2d at 1274 (discussing the

impact of graffiti references to the KKK as meeting the objective standard and

characterizing the KKK as a terrorist organization); *Porter v. Erie Foods Int'l, Inc*., 576

F3d 629, 635 (7th Cir. 2009) (characterizing a noose as a symbol of "terror," and putting

the noose, Klansman's hood and swastika in the same category as being "intended to

arouse fear"). This Court has also found similar imagery gives rise to triable claims. In *Sykes v. Franciscan Skemp Healthcare*, the plaintiff alleged that areas where he worked were decorated with racist words and imagery, including "nigger," "nigger go home," "Mongoloid," and swastikas. No. 99-C-734-C, 2000 WL 34235984 (W.D. Wis. Aug. 21, 2000). In denying summary judgment, the Court stated that "it is unquestionably the case that writings such as "nigger" and "nigger go home" in plaintiff's work area constitute actionable harassment." *Id*. at *3. *See also infra* at 18 (discussing severity of the harassing conduct).

### 2.     The acts of harassment were based on race.

There should be no dispute here that the harassment at Sparx was racial in character. Harassing conduct need not be explicitly racial in order to create a hostile environment, but it "must have either a . . . racial character or purpose to support a Title VII claim." *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999). Harassing conduct must be inherently racial, evidence negative attitudes toward persons of the plaintiff's race, or have racial overtones. *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005) (quoting *Hardin*, 167 F.3d at 345-46).

Spartz wants the Coleman picture to be considered separately from the racist depictions on the dollar. Sparx asserts that "[i]t is nonsensical to allege the picture was on the cooler to harass Miller because he was black when a picture of a white male was on the cooler for a much longer period of time both before and after the Gary Coleman picture was placed on the cooler for an extremely limited time." (Defs. Mem. 35).

Defendants ignore, however, that the Coleman picture was not the only thing posted.[10]  Immediately above Coleman's picture, and covering the language of the notice, was the dollar bill covered with racist images.  Nooses, swastikas, Klansmen, and KKK symbols depict racial hatred towards black persons.  There is no ambiguity.  No minimizing it.  There are few other symbols that reflect hatred of blacks more than those.  The image of those odious depictions above the young smiling face of Gary Coleman only magnifies the racist basis.  The dollar bill and the Coleman picture cannot be separated.  And, if it is true, as Sparx contends, that a prior Hasselhoff picture came down the very night that the Coleman picture and the defaced dollar bill went up, the racist nature of the display is even more evident.  (*See supra* n. 4).  A jury can find that conduct here was based on race.

### 3.    The harassment was severe or pervasive.

With respect to the requirement that harassment be severe or pervasive, the harassing conduct need not be severe *and* pervasive to create liability; one or the other will do.  *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000).  Severity and pervasiveness are inversely related; Title VII may be violated by a sufficiently severe episode occurring only once, while a "relentless pattern of lesser harassment" occurring over a long time period also violates the statute.  *Cerros,* 288 F.3d at 1047.

---

[10] Sparx spends much time asserting that the Coleman picture could not be considered racist on its own.  Of course, it wasn't on its own.  The EEOC does not contend that the picture of Coleman was in and of itself harassing.  But Coleman's picture cannot be brushed off as irrelevant either.  *See* Anita Gates, Gary Coleman Gary Coleman, 'Diff'rent Strokes' Star, Dies at 42, New York Times (May 10, 2010) (noting perception of some that Coleman's characterization on *Diff'rent Strokes* was a form of latter-day minstrelsy).

Here, the harassment was severe.  Certain racial or ethnic slurs or imagery are particularly offensive.  *Daniels*, 937 F.2d at 1274 (discussing extreme nature of graffiti using term "KKK"); *Rodgers v. Western-Southern Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir. 1993) ("Perhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment,' than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates.") (internal citations omitted); *Porter*, 576 F.3d at 635 (7th Cir. 2009) (stating that a noose is "a symbol not just of racial discrimination or of disapproval, but of terror. . . . No less than the swastika or the Klansman's hood, the noose in this context is intended to arouse fear.").

Sparx contends, however, that the conduct occurred only one time for a short period, and consequently, should not be regarded as severe.  Sparx ignores the gravity and threat of the slur, and the impact of the circumstances surrounding its posting then and in the days after.  The display wasn't something that *might* have racial overtones; it was blatantly and horribly racist.  *See Rodgers*, 12 F.3d at 675; *Price v. Wisconsin Servs. Corp.*, 55 F. Supp. 2d 952, 957 (E.D. Wis. 1999) (considering § 1981 racial harassment claim and refusing to accept argument that "periodic" racial slurs cannot be severe or pervasive enough to constitute unlawful harassment because "there is no single act that can more quickly create an abusive working environment than the use of the racial epithet 'nigger.'").  A single instance can be enough, particularly when the circumstances surrounding the incident contribute to the severity of the incident.  There is no "magic

number" of slurs required. *Cerros,* 288 F.3d at 1047. Some words are so outrageous that a single incident may qualify for a hostile work environment claim, *Ezell v. Potter*, 400 F.3d 1041, 1048 (7th Cir. 2005), and unambiguously racial epithets, like those presented here, fall on the more severe end of the spectrum. *Cerros,* 288 F.3d at 1047. The use of the Klan hood, the KKK reference, the swastikas, and the noose are threatening symbols making them more severe examples of racial harassment. *See also Daniels*, 937 F.2d at 1274 n.4 ("single incident [can] give rise to [an] employer's liability for racial harassment under Title VII"); *Taylor v. Metzger*, 706 A.2d 685 (N.J. 1998) (racial harassment claim can be established based on one time use of term "jungle bunny" when such term is uttered in particular circumstances).

The four unequivocally racially charged images posted at Sparx were serious and threatening, distinguishing this case from cases finding racial epithets are stray comments from the employee's past work history. *See Ferguson v. Medical College of Wisc.,* 471 F. Supp. 2d 901, 944 (E.D. Wis. 2007) (discussing stray remarks); *Smith v. Northeastern Illinois Univ.*, 388 F.3d 559, 566 (7th Cir. 2004) (plaintiff heard one racial epithet directed at co-workers on one occasion over many years of work). The unmistakable overtly racial quality of the postings also distinguishes this case from those where the alleged conduct was not as directly racist or threatening. *See, e.g., Johnson v. Milwaukee Sch. Of Eng'g,* 258 F. Supp. 2d 896, 903 (E.D. Wis. 2003) (discussing reference to black employees as "boys"); *Boss v. Rock County, Wis.,* No. 02-C-0678-C, , 2003 WL 23142224,  at *4 (W.D. Wis. Nov. 26, 2003) (plaintiff referred to as "black ghetto girl").

The racial harassment is made more severe here because it was directed at Miller. *Ezell*, 400 F.3d at 1048; *Daniels*, 937 F.2d at 1274. Miller was sent home the night before by Openshaw, who saw the dollar that night and posted the Coleman picture. (*See* PFF 13, 42,44). Jarmuzek was also working that night, when he posted the dollar. Jarmuzek denies knowing Miller's schedule, but Miller regularly started work at 9 a.m. (PFF 45). A jury could find that Jarmuzek and Openshaw knew that Miller, one of the two blacks working at Sparx, would be one of the first to see the racist display.

Harassment where an individual is targeted has more impact than derogatory comments simply made in that person's presence. *Daniels*, 937 F.2d at 1274 (though racist graffiti did not mention plaintiff by name, plaintiff was the only black person working where the graffiti was located); *Mitchell v. Plumbers and Steamfitters Local Union No. 157*, No: 2:08-cv-0230-JMS-WGH, 2010 WL 3614292 at * 5 (S.D. Ind. Sept. 7, 2010) (holding plaintiff showed a hostile work environment where plaintiff was asked to retrieve a rope and discovered it was tied into a noose, a fellow employee who was a supervisor at the job site said "you found the rope that was meant for you," and another employee called plaintiff a n*gger to his face); *compare McPhaul v. Bd. of Comm'rs of Madison Count.*, 226 F.3d 558, 567-68 (7th Cir. 2000) (concluding that plaintiff had no claim for racial harassment despite co-worker's use of the n-word where co-worker repeated another person's comment using the n-word, referenced the skin colors of a mother and child, and reported that her own family had been harassed by the KKK, and where co-worker used the n-word on a weekly basis by repeating others' comments,

21

doing so out of her own immaturity and insensitivity rather than racial animus).  This was not a case of bystander harassment; it was targeted conduct that hit its mark.

Moreover, the defaced dollar with its racist imagery and the smiling Gary Coleman picture were mounted in the Sparx kitchen by the Kitchen Supervisor, who was the former Kitchen Manager and who was training Miller's boss, and Miller's direct supervisor, the Kitchen Manager.  *See Cerros*, 288 F.3d at 1047 (supervisor contributing to harassment was "even worse").  The Seventh Circuit considers the contribution of supervisors to harassing conduct in evaluating whether the conduct is objectively offensive and severe or pervasive.  *See, e.g., id* (stating that supervisor followed plaintiff when he switched shifts in an effort to avoid harassment and that the defendant "not only tolerated the harassment, but even worse, according to the facts found by the district court, its supervisors contributed to the harassment); *Rodgers*, 12 F.3d at 675 (considering use of severe racial epithets by supervisor toward workers); *see also Taylor*, 706 A.2d at 692 ("defendant [county sheriff] did more than merely allow racial harassment to occur at the workplace, he perpetrated it. That circumstance, coupled with the stark meaning of the remark ['jungle bunny'], immeasurably increased its severity.").

Here, both Miller's immediate manager and his fellow supervisor (who was the former Kitchen Manager) participated in the harassing conduct.   While Sparx tries to divorce Openshaw from the dollar bill to make this a case of co-worker harassment, there are at least three reasons that a jury could reject this argument.  First, there is the suspicious timing of Openshaw sending Miller home early on the very night that the

22

postings were hung.  Second, Openshaw already knew who posted the dollar bill when he arrived at work and was confronted by Miller.  And third, although Jarmuzek testified that he obtained and posted the dollar bill after Openshaw had left for the night, (Jarmuzek Dep. 14-21), other evidence indicates much more involvement by Openshaw. For example, Deasy testified that Openshaw, Jarmuzek, the Bar Supervisor and a server had stayed after work for drinks, when they circulated and discussed the dollar.  (PFF 43, 44).  Thus, a jury could find that, even if Openshaw did not physically post the dollar bill, as a manager he should have confiscated it and prevented it from being posted at all.

 A factfinder also could decide that Sparx management's assertion that this conduct was a joke poisoned the environment and altered the terms of Miller's employment long after the display had been taken down.  Even after Miller complained about the racist display, no one at Sparx took it seriously.  Openshaw defended it as a joke, and instead focused on whether Miller would be comparatively offended by a picture of David Hasselhoff.  Deasy did not follow up with Miller or other employees who might have been offended, and did not regard it as her place to assure proper discipline.  (PFF 52, 53).  Indeed, while Deasy believed the bill was offensive and inappropriate, she remains equivocal on whether the bill's depictions are racist, because she believes that it depends on who is looking at the bill, and some might look on it as a work of art.  (PFF 53). Jarmuzek defended it as a joke and got no more than a figurative finger wagging from Sparx, warning him that his racist posting might be "misconstrued" as racist.  Jarmuzek actually was offended because Miller thought that Jarmuzek was racist in posting the bill.

Thus, the postings, even though displayed for a relatively short period of time, unreasonably disrupted Miller's working conditions and affected the way that Miller looked at Sparx as an employer. While Miller was able to continue his job duties that morning, he also sought to have the posting documented by a co-worker. He spent time notifying Deasy when she arrived for her shift. He confronted and argued with Openshaw. He demanded that the posting be removed. He confronted Jarmuzek at his first opportunity, days later, which led to Miller calling Jarmuzek a racist, and according to Jarmuzek, Miller called him that later as well. He was left working in an environment where his employer never saw the postings as more than a bad joke, if not art.

Finally, it is hardly a defense that the display did not affect Miller's job more, and that Miller did not experience another blatantly racist display. Sparx fired Miller three weeks after his complaint. An employer should not obtain summary judgment on a hostile work environment claim where the reason that the victim did not complain again or experience another potential episode is because the employer fires the victim. Such a rationale would reward the retaliatory employer. *See Harbor Ins. Co. v. Schnabel Found. Co.*, 946 F.2d 930, 937 n. 5 (D.C. Cir. 1991) (citing the "legal definition of chutzpah: chutzpah is a young man, convicted of murdering his parents, who argues for mercy on the ground that he is an orphan").

### 4.    Sparx is liable for the harassment.

Employer liability under Title VII is evaluated on two levels; an employer may be liable if: (1) a supervisor is responsible for the harassment; or (2) harassment is done by

a co-worker and the employer is shown to have been negligent in failing to prevent or appropriately respond to the harassment. *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004) (citing *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 432 (7th Cir. 1996)); *Hall v. Bodine Elect.*, 276 F.3d 345, 356 (7th Cir. 2001).

In this case, a jury could find that management and supervisors carried out and condoned the harassment. An employer is liable if the employee's supervisor created the hostile work environment. *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000) (internal citations omitted). Openshaw was indisputably Miller's supervisor, and Jarmuzek was, as former Kitchen Manager, training Openshaw. The facts suggest that Miller may have been set up. When Miller showed up to work on the evening of September 30 to do inventory, Openshaw sent him home. When Miller got to work the next morning, he was confronted in his work area by the Coleman picture posted by Openshaw with the racist dollar bill posted by Jarmuzek on top of it. Openshaw saw the dollar bill the night before and knew about it before he came into work. Thereafter, Sparx management took the position that the display was a joke that Miller had misconstrued and taken out of context.

Further, whether this is a supervisor harassment case or a coworker harassment case, there was no adequate response by Sparx to the harassment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) (holding that the affirmative defense to supervisor harassment requires that the employer show that it exercised reasonable care to correct the behavior and the employee failed to take advantage of corrective

25

measures); *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001) (noting that employer can be held liable for coworker harassment if it does not take reasonable steps to rectify the conduct).  Nesheim said that the dollar bill was a firing offense.  Jarmuzek was not fired nor was he docked a shift or anything similar.  (*See also* PFF 73.)  Instead, he received only verbal warnings, which were muted by Openshaw telling Jarmuzek that Miller had taken the dollar "out of context," and advising Jarmuzek not to do it again.  Similarly, Deasy told Jarmuzek not to do it again because such a racist display might be "misconstrued" and "taken out of context."  Even in response to Miller calling Jarmuzek a racist, Jarmuzek thought they were just "giving each other crap."  There is no evidence that anything at all happened to Openshaw.  (PFF 74).

Sparx contends, however, that Miller did not complain properly under its harassment policy.  It cites to its purported employee handbook and an excerpt from it regarding harassment complaints.  It asserts that Miller "expressly acknowledged he did not follow the procedures outlined in the harassment policy."  (Defs. Mem. 15-16).

Sparx's assertions are both factually wrong and legally irrelevant.  First, Miller complained to Deasy and then to Openshaw.  Even under Sparx's description of its harassment policy, a complainant should "go directly to someone in management or contact anyone at the Sparx company offices," (*id.* at 15), which is exactly what Miller did.  Second, the policy upon which Sparx relies is contained in the handbook that Miller testified was not in place while he worked at Sparx.  (PFF 95).  Third, Miller never "expressly acknowledged" that he did not follow Sparx's procedures for raising a

26

harassment complaint.  Indeed, the entirety of the deposition testimony upon which
Sparx relies for this so-called admission is the following:

Q.     Did you say anything to Kim other than, Did you see this?

A.     No.

(Miller Dep. 54: 16-18).   Fourth, Sparx management indisputably knew about the
harassment.  *Cerros v. Steel Techs. Inc.,* 398 F.3d 944, 952-53 (7th Cir. 2005) (*Cerros II*),
(relevant inquiry under *Faragher/Ellerth* defense is "whether the employee adequately
alerted her employer to the harassment . . . not whether she followed the letter of the
reporting procedures set out in the employer's harassment policy")(internal citations
omitted).

A jury could find that Sparx management and supervisors participated in or later
condoned the harassment by calling it a "joke" and insisting that Miller "misconstrued"
the racist depictions.  Miller appropriately complained.  Sparx did not appropriately
react.  Sparx cannot defend by saying that Miller should have done more, or hide behind
the defense that he did not experience another incident as bad as the original one, where
Sparx diminishes his complaints to this day and where it fired him three weeks later in
retaliation for his complaint.  *See Smith v. Sheahan*, 189 F.3d 529, 535 (7th Cir. 1999)
("Just as an employer may escape liability even if harassment recurs despite its best
efforts, so it can also be liable if the harassment fortuitously stops, but a jury deems its
response to have fallen below the level of care.").

27

**C.      Sparx fired Miller in retaliation for his complaints about the racist postings.**

A jury could find that Sparx fired Miller because he complained about the racist postings.  Using the direct test for evaluating claims of retaliation, the evidence shows that: (1) Miller engaged in protected activity; (2) Miller suffered a materially adverse action; and (3) a causal connection exists between the two.  *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012).  A plaintiff can establish retaliation in violation by constructing a "convincing mosaic" of circumstantial evidence that permits an inference of intentional discrimination by the employer.  *Id.* at 306-07; *Benders,* 515 F.3d at 764); *see also Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th Cir. 2006) (circumstantial evidence which is relevant and probative can support a retaliation case under the direct test); *Sylvester v. SOS Children's Vills. of Ill.*, 453 F.3d 900, 902 (7th Cir. 2006) (holding there was sufficient circumstantial evidence to maintain a retaliation claim).  Circumstantial evidence may include: "suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Harper*, 687 F.3d at 307 (internal citation omitted);

**1.      Miller engaged in protected activity.**

A complaint of racial harassment is a statutorily protected activity.  *Id.* at 306; *see also Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (holding that an official complaint to an employer may be statutorily protected activity if the complaint indicates that discrimination occurred in connection with a protected class under Title VII

and stating that "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient") (internal citation omitted).

Miller complained about the racist display on the kitchen cooler. This is a sufficient act to constitute opposition to matters made unlawful under the Title VII. *Alexander v. Gerhardt Enters., Inc*., 40 F.3d 187, 190 (7th Cir. 1994) (holding that a complaint about one racial slur constituted protected activity). Although Sparx contends that the display does not rise to the level of a Title VII violation, the EEOC need not prove that the underlying conduct was serious enough to violate Title VII. *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 771 (7th Cir. 2008). The plaintiff need only show he or she had a sincere and reasonable belief that the practice opposed was unlawful. *Id*; *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 890-91 (7th Cir. 2004) (holding "utterly baseless" standard applies to both opposition and participation clauses of Title VII anti-retaliation provision).

### 2.    Miller was subject to an adverse action – termination.

To show a materially adverse action, a plaintiff must show that a reasonable person would find the employer's action materially adverse, such that it "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N.*, 548 U.S. at 68 (internal citations omitted). Although Sparx contends that the EEOC cannot show that Miller was subject to an adverse action, (Def. Mem. 30-32), Sparx fired Miller only three weeks after his complaint. Termination is an adverse

employment action. *Johnson*, 325 F.3d at 902; *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003).

> **3.     Substantial evidence suggests a causal link between Miller's complaint and his termination.**

A jury could find that a causal link exists between Miller's complaint and his termination. For purposes of summary judgment analysis, a causal link between protected activity and the employer's adverse action may be established when the plaintiff shows that the protected conduct was a substantial or motivating factor in the employer's decision. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008) (internal citation omitted).[11]

> **a.     Suspicious Timing.**

Miller was fired only three weeks after his complaint. Together with other facts, suspicious timing can raise an inference of a causal connection between statutorily protected activity and an adverse employment action. *Magyar*, 544 F.3d at 772 (internal citation omitted). A three-week period between protected activity and an adverse action

---

[11] The Supreme Court granted certiorari on January 18, 2013, in *University of Texas Southwestern Medical Center v. Nassar*, 12-484, on the following question:

> Whether Title VII's retaliation provision and similarly worded statutes require a plaintiff to prove but-for causation (i.e., that an employer would not have taken an adverse employment action but for an improper motive), or instead require only proof that the employer had a mixed motive (i.e., that an improper motive was one of multiple reasons for the employment action).

The issue before the Supreme Court does not affect this Court's analysis. Under the Seventh Circuit precedent, the plaintiff ultimately must satisfy the "but for" test at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). At the preliminary summary judgment stage, however, it suffices for the plaintiff to bring forward sufficient evidence to show that retaliation was a motivating factor. *Id.*

is sufficient to permit an inference of discriminatory intent. *See Benders v. Bellows &*

*Bellows*, 515 F.3d 757, 764 (7th Cir. 2008) (2 months and 1 week sufficient); *compare*

*Tomanovich*, 457 F.3d at 665 (four-month gap was insufficient to establish causal

connection).

>           **b.    Involvement of persons with knowledge of the complaint in the**
>                   **decision.**

Sparx argues Nesheim, who made the decision to fire Miller, did not know about

Miller's complaint about the dollar bill and made the termination decision prior to the

incident itself. While Nesheim testified that he did not know about Miller's complaint

about the dollar bill, however, Deasy insists that she did tell Nesheim about it. Even

crediting Nesheim's testimony, he concededly acted with the input of Openshaw (who

also was the recipient of Jarmuzek's complaints) and Deasy, both of whom did know

about the complaint. *See Staub v. Proctor Hospital*, 131 S.Ct. 1186 (2011) (recognizing

"cat's paw" theory, where the discriminatory animus of an employee who influenced, but

did not make, the ultimate employment decision can be imputed to employer). Moreover,

while Nesheim testified that he and the other managers started talking about discharging

Miller before his complaints, the final decision to fire Miller concededly was not made

until after his complaint.

>           **c.    Lack of prior warnings**

Miller was fired without any prior warnings, which is suspicious in and of itself.

*See Winarto v. Toshiba Am. Elecs. Components, Inc.,* 274 F.3d 1276, 1284 (9th Cir.

2001) (employer did not rebut inference of retaliation by pointing to plaintiff's declining

performance evaluations because an unwarranted decline in performance review scores can constitute evidence of pretext in retaliation cases).  In addition, Sparx failed to follow its own progressive discipline policy when it fired Miller.  *See Rudin v. Lincoln Cmty. Coll.*, 420 F.3d 712, 723 (7th Cir. 2005) (holding that an employer's failure to follow its own employment policies can constitute circumstantial evidence of retaliation); *Giacoletto v. Amax Zinc Co., Inc.*, 954 F.2d 424, 427 (7th Cir. 1992).   Whatever the specifics of Sparx's progressive discipline policy, an employee was to receive a prior warning before termination in other than the most serious offenses, like theft and drinking on the job.  *Compare Long v. Teachers' Ret. Sys. of the State of Ill.*, 585 F.3d 344, 352-53 (7th Cir. 2009) (inference dissipated where progressive discipline policy placed discretion in employer).  Miller received no such warning.

Sparx asserts it did warn Miller, and argues that summary judgment should be granted because only Miller's self-serving statements dispute Sparx's allegations of Miller's attitude and performance.  Sparx relies on *Sublett v. John Wiley & Sons*, 463 F.3d 731, 740 (7th Cir. 2006), where the Seventh Circuit said that an employee's conclusory statements are insufficient to contradict an employer's negative assessment of his or her work.

Sparx misunderstands *Sublett*.  *Sublett* concerned a situation where the plaintiff presented only generalized self-serving assertions of good performance to rebut an employer's specific criticisms.  "It is not the mere self-serving nature of a nonmovant's affidavit that renders such evidence infirm.  Rather, it is the absence of personal

knowledge or the failure to set forth 'specific facts' . . . that is problematic." *Williams v. Seniff*, 342 F.3d 774, 789 (7th Cir. 2003).   Consequently, an employee can create a triable issue of fact by "specifically refuting facts that allegedly support the employer's claim of performance deficiencies." *Mayne v. Fort Wayne Cardiology*, No. 1:06-CV-288, 2007 WL 3256606 *10 (N.D. Ind. Nov. 2, 2007) (*quoting Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460-61 (7th Cir. 1994). )

Here, substantial evidence exists in addition to Miller's statements that Sparx's performance issues are overblown and a jury could find them not worthy of credence. Furthermore, Miller specifically refutes facts upon which Sparx relies to justify his termination, and does not rely on simply generalized statements of good conduct to rebut specific evidence of poor performance.  *Sublett* therefore does not apply here.

### d.    Experience of Other Employees

Sparx contends that other unidentified employees had been previously terminated for bad attitude or a lack of cooperation with fellow employees.  (Defs. Mem 16, 25).  An employer cannot satisfy its burden at summary judgment by unverifiable assertions of generalized fact.  For example, in *EEOC v. Target Corporation*, 460 F.3d 946 (7th Cir. 2006), the employer justified its failure to hire an applicant based on its assertion that the applicant did not interview well.  The Seventh Circuit held that this generic justification, with nothing more, was insufficient to carry an employer's burden to articulate a legitimate nondiscriminatory reason for an adverse action.  *Id.* at 958.  Similarly, here,

Sparx's flat assertion that others had been similarly treated, without anything more, carries no weight and should be disregarded.

Sparx points to the treatment of Malean, saying that it fired her for bad attitude, and thus the EEOC cannot establish that Miller was treated any differently than employees who had not engaged in protected activities. Malean contends though that she was fired for asserting claims for partial unemployment after Sparx cut her hours. (PFF 114, 116). In other words, Malean asserted a right to a statutory benefit to which she believed she was entitled. And Sparx reacted swiftly, firing her because "[i]f you want part-time unemployment so bad, you can have full time unemployment." (PFF 117). The facts underlying Malean's discharge thus support the EEOC's argument that Miller was fired in retaliation for asserting his protected rights.[12]

### e.    Late-Raised Defense.

Finally, Sparx argues that Miller was fired because he earned too high an hourly wage.[13] This excuse is new: it was not raised at Miller's termination, during the EEOC's investigation, or in response to EEOC's written discovery. (PFF 118). The defense did not come up until Nesheim's recent deposition. A late-raised defense itself can be evidence of pretext. *See DeMarco v. Holy Cross High School*, 4 F.3d 166, 171

---

[12] Even under Sparx's version of Malean's termination, Malean is not similarly situated to Miller. According to Deasy, she and Malean had a heated confrontation in the close quarters of Deasy's office. Among other things, Malean called Deasy a "bitch," and purportedly made Deasy feel threatened. (Deasy Dep. 157:5-25). Sparx does not assert anything remotely similar with respect to Miller.

[13] On the contrary, however, Miller's wage was in line with what he was previously paid. (*See* PFF 7).

(2d Cir. 1993) (stating that pretext inquiry takes into consideration "whether the putative

non-discriminatory purpose was stated only after the allegation of discrimination");

*Castleman v. Acme Boot Co.*, 959 F.2d 1417, 1422 (7th Cir. 1992) ("A jury's conclusion

that an employer's reasons were pretextual can be supported by inconsistencies in . . . the

decisionmaker's testimony.")

### III.  CONCLUSION

A jury could find that Miller was subject to a hostile work environment based on

his race, and then was fired for complaining about it.  Perhaps the jury might decide

differently.  That isn't the question here.  The question is whether, drawing all reasonable

inferences for the EEOC as the nonmoving party, a reasonable jury could find for the

EEOC on its claims.  The EEOC believes that a jury could do so and respectfully requests

that summary judgment should be denied.

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION


Dated:  2-4-13                     By:  s/Laurie A. Vasichek

Laurie A. Vasichek
EEOC - Minneapolis Area Office
330 Second Avenue South, Suite 720
Minneapolis, MN  55401
(612) 335-4061
laurie.vasichek@eeoc.gov


ATTORNEY FOR PLAINTIFF